# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 73325-7-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID D. THOMPSON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: August 1, 2016 |
| | ) | |

VERELLEN, C.J. — In a prosecution for assault in the second degree, circumstantial evidence can be sufficient to prove that the defendant assaulted another with a deadly weapon. Here, the evidence was sufficient to support David Thompson's conviction of assault in the second degree. Further, Thompson has not shown actual prejudice from the admission of the deputy sheriff's testimony about the victim's demeanor. Accordingly, we affirm Thompson's conviction. We vacate Thompson's sentence and remand for a new sentencing hearing at which the sentencing court must make an individualized inquiry into Thompson's present and future ability to pay legal financial obligations.

## FACTS

In January 2014, Thompson was living in an apartment above a detached structure on property owned by Earling Manley. Manley's grandsons, Robert Speers and Adrian Speers, lived in the basement of Manley's home.

On January 3, 2014, Robert Speers and Adrian Speers and their friend Barry Sharp were in the Speers' basement living quarters. Sharp's male dog was with them. Speers and Sharp let Sharp's dog outside, and the dog started playing with Thompson's female dog which was also outside.[1] A few minutes later, Thompson let his male dog outside, and the two male dogs began fighting. Thompson and Speers ran outside and separated the dogs. While trying to separate the dogs, one of the dogs bit Thompson on the hand. Thompson, whose hand was bleeding, took his dog back to his house, and Sharp and Speers took Sharp's dog back into the basement of the main house.

About five minutes later, Thompson came down the stairs into the basement. Speers and Sharp were in the bathroom attending to the injuries Sharp's dog sustained in the fight. Thompson said he was going to get his gun and shoot Sharp's dog. Thompson left the basement and returned about five minutes later carrying a gun.

When Speers heard Thompson returning to the basement, he came out of the bathroom. When he did, Thompson aimed the gun at Speers. Thompson told Speers that he was going to kill the dog and that if Speers got in the way, he would shoot him. When Thompson said this, the end of Thompson's gun was about a foot and a half away from Speers' chest.

Speers pushed the gun away and hit Thompson in the face. Thompson grabbed Speers by the throat, and Adrian Speers jumped on Thompson's back to try

---

[1] All references to "Speers" are to Robert Speers unless otherwise noted.

2

to stop Thompson from attacking his brother. Thompson grabbed his gun and went back up the stairs when he heard a car coming up the driveway.

Speers immediately called an emergency number. While Speers was on the phone, Thompson came back to the basement and tried to convince Speers that the gun he brought to the basement was not a firearm, but rather was a pellet gun that Speers owned when he was younger. Speers, however, was convinced that the gun Thompson pointed at him was a firearm, not a pellet gun:

> Well, when he aimed it level with my chest, I knew it was a real gun because he pulled the semi-auto action on it. I mean, it had a wood stock, and it was--it's like seven inches longer in the barrel than the other gun and twice as thick of a barrel. It didn't have a yellow site [sic] on it like a pellet gun would.[2]

Sharp also believed that the gun Thompson pointed at Speers was a firearm, not a pellet gun. Sharp described the gun as a "regular, good-sized" black rifle with a large or thick barrel.[3]

Two San Juan County deputy sheriffs responded to Speers' emergency call. The deputies arrested Thompson.

Thompson was charged with one count of assault in the second degree (assault with a deadly weapon), domestic violence; one count of felony harassment, domestic violence; and one count of possession of a dangerous weapon. The charge of possession of a dangerous weapon was dismissed.

---

[2] Report of Proceedings (RP) (Oct. 21, 2014) at 247.

[3] Id. at 322.

Thompson was convicted and moved for a new trial. The court granted his motion, finding that the State failed to provide exculpatory evidence related to a witness.

On retrial, the State introduced the pellet gun Speers claimed he owned when he was younger. Speers testified that he was sure that the pellet gun was not the weapon Thompson pointed at him. Sharp also testified that the pellet gun the State introduced into evidence was not the weapon he saw Thompson carrying.

The jury on retrial found Thompson guilty of assault in the second degree and harassment and answered "no" on both domestic violence special verdicts. The court sentenced Thompson to 78 months and imposed both mandatory and discretionary legal financial obligations (LFOs). Thompson appeals.

## ANALYSIS

### Sufficiency of the Evidence

Thompson challenges the sufficiency of the evidence to support his conviction of assault with a deadly weapon. The due process clauses of the federal and state constitutions require the State to prove every element of the crime charged beyond a reasonable doubt.[4] A claim of insufficiency of the evidence admits the truth of the State's evidence and all reasonable inferences from that evidence.[5] "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the

---

[4] U.S. CONST. AMEND. XIV; WASH. CONST. ART. I, § 3; Apprendi v. New Jersey, 530 U.S. 466, 476-77, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

[5] State v. Kintz, 169 Wn.2d 537, 551, 238 P.3d 470 (2010).

crime beyond a reasonable doubt."[6] In determining the sufficiency of the evidence, circumstantial evidence and direct evidence are equally reliable.[7]

A person is guilty of assault in the second degree if the person, under circumstances not amounting to assault in the first degree, assaults another with a deadly weapon.[8] A "deadly weapon" means:

> any explosive or loaded or unloaded firearm, and shall include any other weapon, device, instrument, article, or substance, including a "vehicle" . . . which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm.[9]

Thompson argues that the State failed to prove that he used a deadly weapon during the assault because Speers and Sharp testified that the pellet gun the State introduced into evidence was not the gun Thompson pointed at Speers during the assault.[10] But "[t]he State need not introduce the actual deadly weapon at trial."[11] Circumstantial evidence such as a witness's description of the gun and statement that the witness firmly believed the weapon was a gun may be sufficient, particularly

---

[6] Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).

[7] State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

[8] RCW 9A.36.021(a), (c).

[9] RCW 9A.04.110(6).

[10] Thompson's argument is premised on the contention that the State's theory was that Thompson assaulted Speers with the pellet gun the State introduced into evidence. This is incorrect. During closing argument, the State acknowledged that there was an issue about whether Thompson assaulted Speers with a firearm or a pellet gun, but argued that "both of those things in this case are deadly weapons." RP (Oct. 22, 2014) at 425.

[11] State v. Bowman, 36 Wn. App. 798, 803, 678 P.2d 1273 (1984).

when coupled with a defendant's threats to use the gun.[12] A defendant's express verbal threat to shoot the victim necessarily implies that the defendant had access to a firearm capable of killing or seriously injuring the victim.[13]

Here, both Speers and Sharp described the gun Thompson pointed at Speers, and both testified that they believed it was a firearm, not a pellet gun. A firearm is deemed deadly per se, regardless of whether it is loaded.[14] Further, both Speers and Sharp testified that Thompson threatened to shoot Speers. Viewing the evidence in the light most favorable to the State and drawing all reasonable inferences in favor of the State, any rational trier of fact could have found the essential elements of assault with a deadly weapon beyond a reasonable doubt.[15]

*Testimony of Deputy Harvey*

On direct examination, San Juan County Deputy Raymond Harvey, one of the deputy sheriffs who responded to Speers' emergency call, testified about Speers' demeanor when he encountered him:

Q. What was [Speers'] demeanor?

A. He was breathing heavy and very point blank with his story with me.

---

[12] Id.

[13] State v. Hentz, 99 Wn.2d 538, 541, 663 P.2d 476 (1983).

[14] RCW 9A.04.110(6); State v. Taylor, 97 Wn. App. 123, 126, 982 P.2d 687 (1999).

[15] Further, we note that there is nothing in the record to suggest that the pellet gun the State introduced into evidence was not operational. The record contains sufficient evidence that Thompson threatened to use the pellet gun to shoot Speers in a way that would have caused substantial bodily harm. Even if the jury believed that Thompson used the pellet gun in the assault, the evidence was sufficient to support Thompson's conviction of assault with a deadly weapon. See Taylor, 97 Wn. App. at 128.

Q. What do you mean by point blank?

A. Meaning there wasn't any hesitation in what he relayed to me.

Q. Why is that significant?

A. Generally, somebody making a story up has some hesitation because they actually have to think about what they are saying rather than recalling the information from memory.

Q. Are you saying that based on your experience as a law enforcement officer?

A. I am.[16]

Defense counsel did not object to Deputy Harvey's testimony about Speers' demeanor. Thompson argues that Deputy Harvey's testimony invaded the province of the jury and, accordingly, admission of the testimony was a manifest error affecting a constitutional right that he may raise for the first time on appeal.

"A witness's expression of personal belief about the veracity of another witness is inappropriate opinion testimony in criminal trials."[17] The admission of such testimony may be reversible error because such evidence violates the defendant's constitutional right to a jury trial.[18] Here, Deputy Harvey testified that a person who is making up a story generally hesitates when telling the story because the person has to "think about what they are saying rather than recalling the information from memory."[19] He testified that Speers did not hesitate when relating what had

---

[16] RP (Oct. 21, 2014) at 291.

[17] State v. Perez-Valdez, 172 Wn.2d 808, 817, 265 P.3d 853 (2011); see also State v. Montgomery, 163 Wn.2d 577, 591, 183 P.3d 267 (2008) (among the areas which are "clearly inappropriate for opinion testimony in criminal trials" is an expression of personal belief as to the veracity of a witness).

[18] Perez-Valdez, 172 Wn.2d at 817.

[19] RP (Oct. 21, 2014) at 291.

happened. The obvious inference from Deputy Harvey's testimony is that he did not believe Speers was making up his story about the assault, but rather was telling the truth. Deputy Harvey's testimony amounted to improper opinion testimony about Speers' veracity.

Because Thompson did not object at trial to Deputy Harvey's testimony about Speers' demeanor, we must determine if Thompson can raise this issue for the first time on appeal. Generally, we do not consider issues raised for the first time on appeal.[20] An exception to this rule allows a party to raise for the first time on appeal a manifest error affecting a constitutional right.[21] We construe this exception to RAP 2.5(a) narrowly.[22]

A constitutional error is "manifest" if it actually affected the defendant's rights at trial.[23] With regard to witness opinion testimony, manifest error "requires a nearly explicit statement by the witness that the witness believed the accusing victim.[24] Further, "manifest" requires a showing of actual prejudice.[25] To show actual prejudice, the defendant must make a plausible showing that the error had practical and identifiable consequences in the trial of the case.[26]

---

[20] RAP 2.5(a); State v. Stoddard, 192 Wn. App. 222, 226, 366 P.3d 474 (2016).

[21] RAP 2.5(a)(3).

[22] State v. WWJ Corp., 138 Wn.2d 595, 603, 980 P.2d 1257 (1999).

[23] State v. Kirkman, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007).

[24] Id. at 936.

[25] State v. Walsh, 143 Wn.2d 1, 8, 17 P.3d 591 (2001).

[26] WWJ Corp., 138 Wn.2d at 603.

Important to determining whether the defendant was actually prejudiced by witness opinion testimony is whether the jury was properly instructed.[27] The courts in State v. Kirkman[28] and State v. Montgomery[29] found no prejudice from improper opinion testimony on witness credibility where the jury was instructed that jurors are the sole judges of the credibility of witnesses and are not bound by expert witness opinions.[30] The jury in this case was given virtually identical instructions. We presume the jury followed the court's instructions where, as here, there is no evidence to the contrary.[31] Thompson has not shown actual prejudice from the admission of Deputy Harvey's testimony about Speers' demeanor.

Further, a manifest constitutional error is subject to a harmless error analysis.[32] We employ the "overwhelming untainted evidence test" to determine if the error was harmless beyond a reasonable doubt.[33] Under that test, we examine whether the untainted evidence is so overwhelming that it leads necessarily to a finding of guilt.[34] We presume that constitutional errors are prejudicial, and the State

---

[27] Montgomery, 163 Wn.2d at 595.

[28] 159 Wn.2d 918, 155 P.3d 125 (2007).

[29] 163 Wn.2d 577, 183 P.3d 267 (2008).

[30] Kirkman, 159 Wn.2d at 937; Montgomery, 163 Wn.2d at 595-96.

[31] Montgomery, 163 Wn.2d at 596.

[32] Kirkman, 159 Wn.2d at 927.

[33] State v. Guloy, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985).

[34] Id.

must convince us beyond a reasonable doubt that any reasonable jury would have reached the same result absent the error.[35]

Here, we are convinced beyond a reasonable doubt that any reasonable jury would have reached the same result absent Deputy Harvey's testimony about Speers' demeanor. The unrebutted testimony of Robert Speers, Adrian Speers, and Sharp was that Thompson pointed a gun at Robert Speers and threatened to shoot him. Any error arising from the admission of Deputy Harvey's testimony was harmless beyond a reasonable doubt.

Thompson argues the prosecutor committed misconduct by arguing to the jury that Deputy Harvey had determined that Speers was telling the truth. Thompson does not, however, cite to any specific statements by the prosecutor on which he bases his claim of misconduct. During closing argument, the prosecutor argued:

> Now, how do we know that Robbie [Speers] is telling the truth? That's for you to decide. You saw his demeanor on the stand, what he was like when he was speaking to you. And we know that Deputy Harvey, who saw Robbie Speers that day, he testified that when Robbie told him that the Defendant pointed a gun at him and threatened to kill him, that when he said that, he said it in a way that sounded truthful to Deputy Harvey based on his law enforcement experience.[36]

Thompson did not object to these statements. Accordingly, to prevail on his claim of prosecutorial misconduct, Thompson must establish "'that the misconduct

---

[35] State v. Watt, 160 Wn.2d 626, 635, 160 P.3d 640 (2007); State v. Hudson, 150 Wn. App. 646, 656, 208 P.3d 1236 (2009).

[36] RP (Oct. 22, 2014) at 421.

was so flagrant and ill-intentioned that it caused an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury.'"[37]

Thompson has not met his burden. A prosecutor does not commit misconduct any time he or she mentions credibility.[38] "[A] prosecutor may comment on a witness's veracity as long as a personal opinion is not expressed and as long as the comments are not intended to incite the passion of the jury.[39] Here, the prosecutor did not express her personal opinion as to Speers' veracity. Nor do we conclude that her comments were intended to incite the passion of the jury. Thompson has not established prosecutorial misconduct.

*Legal Financial Obligations*

Thompson argues that he is entitled to a new sentencing hearing because the trial court imposed LFOs without making an individualized inquiry into his ability to pay. The State argues that because Thompson did not raise this issue below, he is precluded from raising it on appeal.

In State v. Blazina, the Washington Supreme Court held that "a trial court has a statutory obligation to make an individualized inquiry into a defendant's current and future ability to pay before the court imposes LFOs."[40] In State v. Duncan, the defendant did not object at trial to the trial court's imposition of LFOs and, like Thompson, argued for the first time on appeal that the record did not support a

---

[37] State v. Hecht, 179 Wn. App. 497, 503, 319 P.3d 836 (2014) (quoting In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012)).

[38] State v. Edvalds, 157 Wn. App. 517, 525, 237 P.3d 368 (2010).

[39] Id.

[40] State v. Blazina, 182 Wn.2d 827, 830, 344 P.3d 680 (2015).

finding that he had or would have any likelihood of being able to pay the LFOs.[41]

Relying on Blazina and its progeny, the court remanded to the trial court "for resentencing with proper consideration of Duncan's ability to pay LFOs."[42]

Here, the record does not show that the sentencing judge made an individualized inquiry into Thompson's current and future ability to pay before imposing LFOs. Remand for resentencing is appropriate.

## CONCLUSION

We affirm Thompson's conviction, vacate the sentence, and remand for a new sentencing hearing at which the court must make an individualized inquiry into Thompson's current and future ability to pay LFOs.

WE CONCUR:

---

[41] State v. Duncan, 185 Wn.2d 430, 435, ___ P.3d ___ (2016).

[42] Id. at 437-38.